# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

FILED
JAMES BONINI
CLERK

2004 FEB -2 P 4: 21

C2-04- 084

JUDGE HOLSCHUH

MAGISTRATE JUDGE ABEL

|  |  |
|---|---|
| Monongahela Power Company<br>1310 Fairmont Avenue<br>Fairmont, WV 26554 US | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| Alan R. Schriber, Chairman of the<br>Public Utilities Commission of Ohio<br>180 East Broad Street<br>Columbus, Ohio 43215 | : |
|  | : |
| and | : |
|  | : |
| Ronda Hartman Fergus, Member,<br>Public Utilities Commission of Ohio<br>180 East Broad Street<br>Columbus, Ohio 43215 | : |
|  | : |
| and | : |
|  | : |
| Judith A. Jones, Member,<br>Public Utilities Commission of Ohio<br>180 East Broad Street<br>Columbus, Ohio 43215 | : |
|  | : |
| and | : |
|  | : |
| Donald L. Mason, Member,<br>Public Utilities Commission of Ohio<br>180 East Broad Street<br>Columbus, Ohio 43215 | : |
|  | : |
| and | : |
|  | : |

Clarence D. Rogers, Jr., Member,          :
Public Utilities Commission of Ohio       :
180 East Broad Street                     :
Columbus, Ohio 43215,                     :
                                          :
in their official capacities as           :
Commissioners of the Public               :
Utilities Commission of Ohio,             :
                                          :
                    Defendants.           :
_____ :

## COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

Plaintiff, Monongahela Power Company ("Mon Power"), for its claims against

Defendants, Alan R. Schriber, Ronda Hartman Fergus, Judith A. Jones, Donald L. Mason,

and Clarence D. Rogers, Jr. (collectively, "Defendants"), in their official capacities as

Commissioners of the Public Utilities Commission of Ohio (the "Commission"), alleges

as follows:

### NATURE OF THE ACTION

1.      Mon Power brings this action as a consequence of the Defendants'

issuance of orders forcing Mon Power to sell power to its medium and large-size

commercial and industrial and street lighting customers (hereafter "large commercial and

industrial customers") at rates the Defendants know are well below the cost that Mon

Power incurs to purchase that power at wholesale.  The Defendants are forcing Mon

Power to sell power to these customers at a substantial loss without making any finding

2

electric utilities during the period designated under the Act as the "market development period."

6.    Mon Power requests that the Court enjoin Defendants from enforcing those provisions of the Restructuring Act, and specifically Ohio Rev. Code §§ 4928.34(A)(6), 4928.35(A) and 4928.40, that provide for a rate freeze without any opportunity for utilities to demonstrate a need for higher rates in order to obtain a constitutionally required fair and reasonable return on their investment.

## THE PARTIES

7.    Plaintiff, Mon Power, is an Ohio corporation engaged in the business of distribution and transmission of electric energy to consumers in southeastern Ohio. Mon Power is an electric light company and thus a "public utility" as defined under Sections 4905.02 and 4905.03(A)(4) of the Ohio Revised Code. Mon Power is also an "electric utility" as defined in Ohio Rev. Code § 4928.01(A)(4).

8.    The Defendants Alan R. Schriber, Ronda Hartman Fergus, Judith A. Jones, Donald L. Mason and Clarence D. Rogers, Jr., are the Commissioners of the Public Utilities Commission of Ohio (the "Commission"). This Complaint is brought against the Defendants acting in their official capacities for actions they have taken under color of state law to deprive Mon Power of rights secured by federal law.

## JURISDICTION AND VENUE

9.    This is an action for declaratory and injunctive relief brought, pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 1983, to secure rights guaranteed to Mon Power by the Constitution and laws of the United States. Subject matter jurisdiction is conferred on this Court by 28 U.S. C. §§ 1331 and 1343.

4

10.     Venue is proper in this district under 28 U.S.C. 1391(b) and Local Rule 82.1 both because the Defendants conduct their official business in Columbus, Ohio, and because a substantial part of the events giving rise to the claims occurred in this district.

## BACKGROUND

**THE STATE RESTRUCTURING ACT**

11.     On June 22, 1999, the 123rd Ohio General Assembly passed Am. Sub. S.B. 3 (the "Restructuring Act") to restructure the electric utilities in Ohio and transition the electric energy industry into a competitive industry.  The Restructuring Act is codified in Chapter 4928 of the Ohio Revised Code and the pertinent provisions at issue here are Ohio Rev. Code §§ 4928.34(A)(6), 4928.35(A) and 4928.40.

12.     Under the Restructuring Act, Ohio electric utilities were required to implement a transition plan that gives their retail customers the right to purchase electricity from competing retail suppliers.  The Restructuring Act also required the utilities to restructure the way they are organized and how they charge for the service they provide.

13.     Ohio Rev. Code § 4928.40 obligates the utilities to provide for a "market development period" during which time their rates to their retail customers are frozen. The market development period will end on December 31, 2005, although the Commission can issue an order authorizing an earlier termination date if it finds either that 20% of the utility's load has switched suppliers or that effective competition exists in the utility's certified territory.

**THE COMMISSION-APPROVED STIPULATION IMPLEMENTING MON POWER'S TRANSITION PLAN**

14.     As required by the Restructuring Act, Mon Power filed a proposed transition plan, and the Commission initiated a proceeding to review that plan. After extensive negotiations, the parties to the proceeding, including Mon Power, the Commission's Staff, a coalition of Mon Power's industrial customers, and other interveners, executed a Stipulation and Recommendation (the "Stipulation") designed to resolve the proceeding in a way that balanced the parties' respective interests. In the Stipulation, Mon Power made a number of concessions sought by the Commission Staff or customers, including an agreement to limit the recovery of certain costs to which it was entitled under the Restructuring Act, and to keep in place its existing retail rates, which had not changed since 1995.[1]

15.     Section IV of the Stipulation was entitled "FROZEN RATES AND MARKET DEVELOPMENT PERIOD." It provided that the market development period – the period under the Restructuring Act during which retail rates were to be frozen – would terminate for Mon Power's large commercial and industrial customers on December 31, 2003. The last sentence of Section IV reads as follows:

> By this Stipulation, Monongahela Power, supported by the other Signatory Parties, applies to the Commission for authorization of a market development period termination date for industrials and large commercial customers of December 31, 2003, based upon the agreement to forego the recovery of transition costs beyond that date (See Ohio Revised Code § 4928.38)

---

[1]     Although Mon Power's base rates were last changed in 1995, there were some subsequent minor changes in the fuel component of its rates. Since January 1, 2001, however, the fuel component has been frozen at its August 1, 1999 level.

6

Thus, the Stipulation expressly called for, and requested the Commission's approval of, the termination of the market development period for Mon Power's large commercial and industrial customers – and thus the termination of the rate freeze for these customers – as of December 31, 2003.

16. Section IV of the Stipulation also provided that the market development period for Mon Power's other customers terminates on December 31, 2005, which is the termination date provided for in the Restructuring Act. For certain of these customers, Mon Power was entitled to request an earlier termination date by making a filing showing that the statutory conditions for an early termination had been met.

17. Section XVIII of the Stipulation made clear that it constituted a negotiated resolution of a number of issues and that the parties' agreement was dependent upon the approval of the entire agreement. To this end, the parties, including the Commission Staff, stated in Section XVIII that "the willingness of the Signatory Parties to sponsor this document jointly is predicated on the reasonableness of the Stipulation and Recommendation taken as a whole." They went on to provide in the same section that, if the Commission rejected or modified any part of the Stipulation, any party would have the right to withdraw.

18. After conducting an evidentiary hearing, the Commission issued an order on October 5, 2000, approving the Stipulation and thus obtaining for retail ratepayers the benefits that Mon Power had offered in the Stipulation.

19. Although the Commission altered other provisions of the Stipulation in minor respects, the Commission did not modify or reject the Stipulation's provision for the termination of the market development period for large commercial and industrial

7

customers on December 31, 2003, or deny the request in the Stipulation that the

Commission authorize the termination of the market development period as of that date.

To the contrary, the Commission specifically noted at page 10 of its October 5, 2000

order that under the Stipulation a regulatory transition charge would be in effect for the

market development period of the respective classes, and that for the large commercial

and industrial customers the charge would end on December 31, 2003. No party opposed

the Stipulation, and no party sought rehearing or appealed the Commission's order

approving the Stipulation.

      20.     Mon Power fully complied with the terms of the Stipulation and engaged

in a restructuring pointed toward retail competition. Pursuant to Section VII of the

Stipulation, Mon Power transferred ownership of its electric generation facilities to an

affiliate – Allegheny Energy Supply Company, LLC ("Allegheny Supply").

**MON POWER ACQUIRES A POWER SUPPLY TO SATISFY ITS RETAIL
SALES OBLIGATIONS**

      21.     In order to be able to supply its retail customers with electricity after it

transferred away ownership of its electric generation facilities, Mon Power executed a

Power Sales Agreement ("Sales Agreement") with Allegheny Supply. The Sales

Agreement provides for the wholesale sale of power at rates that were tied to the retail

rate freeze and thus allowed Mon Power to recover its costs when it resold that power to

its retail customers at the frozen rates.

      22.     The Sales Agreement required Allegheny Supply to provide enough power

to serve all of Mon Power's retail load for the duration of the rate freeze periods

applicable to the different classes of retail customers served by Mon Power. This

included not only Mon Power's large commercial and industrial customers, whose rate

8

freeze terminated at the end of 2003 under the Stipulation, but all of Mon Power's other retail customers, whose rate freeze terminates at the end of 2005.

23.     Because Allegheny Supply's obligation to sell power for Mon Power to serve its other retail customers lasts until the end of 2005, Section 8.1 of the Sales Agreement provided that the Agreement would stay in effect through the "Transition Period," which was defined in Article I as lasting through December 31, 2005.

24.     In agreeing to sell power to Mon Power at a rate that was low enough to allow Mon Power to recover its purchased power costs in the frozen retail rates, Allegheny Supply took the risk that market prices would exceed these levels and that it would lose money by selling to Mon Power at the contract price instead of to other customers at higher market prices.  However, Allegheny Supply was willing to take this risk only to the extent and for the duration of the rate freeze periods established in the Stipulation.  Thus, the Sales Agreement included provisions ensuring that Allegheny Supply's obligation to sell power to supply Mon Power's large commercial and industrial customers terminated on December 31, 2003, when Mon Power's rate freeze applicable to those customers terminated under the Stipulation.

25.     This termination of Allegheny Supply's obligation to supply power to serve Mon Power's large commercial and industrial customers was implemented through the operation of two provisions in the Sales Agreement.

26.     First, Section 2.2 of the Sales Agreement established the "Contract Quantity" that Allegheny Supply is obligated to supply.  This obligation is equal to all "Default Service" Schedules submitted by Mon Power.

9

27. Second, Article I defines "Default Service" as Mon Power's "obligation to provide generation service to all retail customers within its Ohio jurisdiction, according to statutory and regulatory requirements, as well as the Settlement . . ." (emphasis added). By including this reference to the "Settlement" (which is referred to in this Complaint as the "Stipulation"), Mon Power and Allegheny Supply incorporated into the Sales Agreement the Settlement's termination of the market development period for Mon Power's large commercial and industrial customers as of December 31, 2003. Mon Power and Allegheny Supply thus implemented through this definition their agreement to terminate Allegheny Supply's obligation to provide power to serve Mon Power's large commercial and industrial customers as of December 31, 2003.

28. In entering into the Sales Agreement with Allegheny Supply, Mon Power affirmatively relied on the Stipulation and its provision that the rate freeze would end for large commercial and industrial customers at the end of 2003. Because Ohio Rev. Code §4928.14(A) allowed Mon Power to charge "market-based" rates after the lifting of the rate freeze, Mon Power would be able to recover from its customers any increased power purchase costs that it might incur after December 31, 2003 as a result of changing market conditions.

29. Since the time that the Stipulation was approved, the average market price for electricity in Mon Power's region has risen significantly above the rates charged under the rate freeze. This means that, by December 31, 2003, the rate at which Mon Power purchased wholesale power from Allegheny Supply under the Sales Agreement, as well as the frozen rates that Mon Power was required to charge its customers, were both considerably below market prices.

10

30.     One consequence of the below-market rates that have been charged by Mon Power as a result of the rate freeze is that none of Mon Power's potential competitors for the sale of electricity to retail customers has been able to meet Mon Power's artificially low prices.  As a result, alternative suppliers have not attempted to offer competitive supplies to Mon Power's retail customers, and consequently no such customers have switched suppliers.

## THE COMMISSION'S REPUDIATION OF THE STIPULATION AND DENIAL OF THE RECOVERY OF MON POWER'S WHOLESALE POWER COSTS

31.     In early 2003, in anticipation of the December 31, 2003 termination of Mon Power's market development period for its large commercial and industrial customers and the corresponding expiration of Allegheny Supply's obligation under the Sales Agreement to supply power for Mon Power to serve these customers, Mon Power conducted a competitive bid process, known as a "Request for Proposals."  This process called for the submission of proposals under which Mon Power could purchase, at fixed rates based on current market conditions, the power it needs to supply its large commercial and industrial customers after December 31, 2003.

32.     In conducting the Request for Proposals, Mon Power worked closely with the Commission.  Mon Power used terms and conditions established by the Commission, and Mon Power allowed the Commission both to review the Request for Proposals before it was issued and to supervise the evaluation of the offers that were submitted in response. Finally, Mon Power allowed the Commission to confirm the results of the process, and to ensure that Mon Power had indeed selected the lowest-priced bid from all conforming offers.

33.     At no time during the Request for Proposals process did the Commission ever hold that the market development period would not terminate on December 31, 2003 for large commercial and industrial customers or that Mon Power would not be able to pass through to its customers the costs of purchasing power under the contract that would result from the Request for Proposals. To the contrary, the Commission's actions in working with Mon Power and supervising the Request for Proposals indicated that the Commission expected the market development period to terminate at the end of 2003, as provided in the Stipulation that it had approved.

34.     Three suppliers submitted bids in response to the Request for Proposals. One of these was a nonconforming bid and thus had to be rejected. Of the remaining two bids, the lowest was submitted by Mon Power's affiliate, Allegheny Supply. Unlike the below-market price charged under the Sales Agreement, however, this new Allegheny Supply bid reflected current market conditions, and thus provided for a fixed price that, while competitive under current market conditions, was significantly higher than the fixed price in the Sales Agreement.

35.     On October 8, 2003, Mon Power submitted to the Commission an Application for the approval of a new fixed-price contract with Allegheny Supply resulting from the Request for Proposals and for the establishment of new retail rates for its large commercial and industrial customers based on the actual costs that it would incur under that new contract.

36.     Notwithstanding that it had joined in and approved the Stipulation providing that the rate freeze for large commercial and industrial customers would terminate on December 31, 2003, and notwithstanding that the Commission had worked

closely with Mon Power through the Request for Proposals process to obtain a new

contract, the Commission issued an order on October 22, 2003, denying the request that

the new contract with Allegheny Supply be approved. The Commission's action caused

the new contract to terminate automatically under the terms of the Request for Proposals.

The Commission also rejected Mon Power's request to establish retail rates sufficient to

recover its wholesale costs under the new contract. Instead, the Commission ordered that

the rate freeze must remain in effect for large commercial and industrial customers until

the end of 2005.

37.     The Commission made no findings that the price contained in the new

contract resulting from the Request for Proposals was unreasonable or above market or

that the Request for Proposals process was flawed, or that Mon Power had deviated from

any of the Commission's requirements in conducting the Request for Proposals. Instead,

the sum total of the Commission's reasoning for rejecting the contract, which appears in

paragraph 21 of the order, is as follows:

> The Commission is troubled that the Mon Power [Request for Proposals]
> process resulted in only two viable bids. Further, the Commission is
> disturbed that the lowest and winning bid, as submitted by Mon Power's
> unregulated affiliate, would result in significant increases for Mon Power's
> commercial and industrial customers. Accordingly, Mon Power's motion
> for approval of the winning bid from the October 2003 [Request for
> Proposals] process should be denied.

38.     In referring to the fact that the winning bid would result in significant

increases in rates for large commercial and industrial customers, the Commission made

no inquiry, much less any findings, as to whether in fact the market price of purchased

power also had increased significantly. Nor did the Commission offer any guidance as to

how Mon Power was to purchase wholesale power at prices that would allow it to retain

13

its 1995 rates in place for large commercial and industrial customers and not suffer losses in making sales to these customers.

39.     With respect to its holding that the rate freeze would extend through the end of 2005 for Mon Power's large commercial and industrial customers, the Commission found in paragraph 22 of its order that there had not been the requisite amount of customer switching and that the results of the Request for Proposals (i.e., only two viable bids) indicated that there is not "effective competition" in Mon Power's service territory, which are the conditions required under Ohio Rev. Code § 4928.40 for the early termination of the market development period.  The Commission's analysis of the statutory conditions was made as if the Commission had not already approved the Stipulation in 2000, which was conditioned on the Commission finding at that time that the statutory conditions for the termination of the market development period had been satisfied.

40.     The Commission's October 22, 2003 order thus constituted a repudiation of the Stipulation that it previously had approved, but only after Mon Power had performed its side of the bargain, including all of the concessions it had made in reliance on the rate freeze being lifted at the end of 2003.

41.     On November 21, 2003, Mon Power filed an Application for Rehearing of the Commission's order.  The Commission issued an order denying Mon Power's application for rehearing on December 17, 2003.  The Commission again made no findings as to the reasonableness of the contract price with Allegheny Supply resulting from the Request for Proposals or as to what a reasonable price for power should be.  The Commission instead relied entirely upon the assertion in paragraph 10 of its October 22,

2003 order that it is without authority under the Restructuring Act to terminate the rate freeze unless it finds that 20% of Mon Power's customers have switched to alternative suppliers or that effective competition exists in Mon Power's service territory – conditions that the Commission asserted had not been met.

42. In paragraph 11 of its December 17, 2003 order, the Commission refused to consider the merits of Mon Power's arguments that it was entitled to recover the costs of purchased power in its retail rates and that the frozen retail rate was so low as to be confiscatory. The Commission held that it was bound under the Restructuring Act to maintain the rate freeze and that it was without jurisdiction to consider Mon Power's arguments because they go to whether the Restructuring Act is unlawful or unconstitutional.

43. The Commission's orders of October 22 and December 17, 2003 left Mon Power in an untenable position. On the one hand, Mon Power's existing Sales Agreement with Allegheny Supply terminated with respect to the supply of power for Mon Power's large commercial and industrial customers. On the other hand, the new contract with Allegheny Supply that resulted from the Request for Proposals included as a precondition to its effectiveness that the Commission approve Mon Power's recovery of its purchases under the contract in Mon Power's retail rates to its large commercial and industrial customers. As a consequence of the Commission's orders, the new contract terminated, leaving Mon Power with no fixed-price contract that it could use to serve its large commercial and industrial customers.

44. Consequently, Mon Power currently is purchasing wholesale power at spot market prices to meet the needs of its large commercial and industrial customers. These

spot market purchases, which are the cheapest available to Mon Power without a

Commission-approved long-term contract, are made through a pre-existing contract with

Allegheny Supply that permits Mon Power to purchase power at spot market prices in

Mon Power's region. Given that Allegheny's obligation under the existing Sales

Agreement to supply power to serve Mon Power's large commercial and industrial

customers terminated at the end of 2003 and the long-term contract intended to replace

the Sales Agreement had been rejected by the Commission, Mon Power had no choice

but to purchase all of its power to serve its large commercial and industrial customers

under this spot contract.

45.     The spot market purchases that Mon Power makes are wholesale

purchases in interstate commerce and thus are subject to FERC's jurisdiction under the

Federal Power Act. The contract under which these purchases are made has been filed

with and accepted by FERC in accordance with Section 205 of the Federal Power Act, 16

U.S.C. § 824d.

## THE COMMISSION STILL REFUSES TO ACT TO PERMIT RECOVERY OF WHOLESALE POWER PURCHASE COSTS

46.     On December 30, 2003, Mon Power filed an Application with the

Commission to approve the recovery from its large commercial and industrial customers

of the costs of wholesale power purchases that Mon Power would incur to serve those

customers under its spot contract with Allegheny Supply. Mon Power filed this

Application because the Commission had rejected the long-term contract with Allegheny

Supply that had resulted from the Request for Proposals, which in turn caused that

contract to terminate. Mon Power does not expect that its Application will be granted in

light of the Commission's earlier orders holding that the rate freeze must remain in place

16

through 2005. However, Mon Power wanted to place before the Commission the actual costs that Mon Power now is required to incur under the spot contract in order to serve its large commercial and industrial customers in order to make clear the consequences of the Commission's orders regarding the rate freeze.

47.     Mon Power pointed out in its Application that it would be incurring costs to purchase power at wholesale at current spot market prices that significantly exceed the frozen retail rates that it is allowed to charge its large commercial and industrial customers. Mon Power requested that it be permitted to collect from those customers, in addition to the frozen rate, a surcharge that would recover the difference between the current market-based wholesale price and the below-market frozen retail rate.

48.     Mon Power also noted that its obligation to purchase power to serve its large commercial and industrial customers at market rates commenced on January 1, 2004, and that if the Commission does not grant relief expeditiously, Mon Power will be forced to suffer losses when it bills its customers for their January purchases. Mon Power therefore requested that the Commission rule on its Application no later than January 15, 2004.

49.     Notwithstanding the need for an expeditious ruling by the Commission in order for Mon Power to avoid incurring losses, the Commission has refused to rule on Mon Power's Application. The Commission has no obligation to rule on Mon Power's Application by any particular date, and the Commission has not given any indication that it will rule on this request in time to permit Mon Power to recover its purchase power costs.

**THE RATE FREEZE IS INTERFERING WITH INTERSTATE COMMERCE
AND IS CAUSING MON POWER TO LOSE MILLIONS OF DOLLARS**

50.     Under the Restructuring Act, Mon Power is obligated to serve its large

commercial and industrial customers that do not switch to alternative suppliers. As

discussed above, to date none of these customers have switched to other suppliers

because Mon Power's retail rates have been frozen at levels that are significantly below

wholesale market prices.

51.     As discussed above, in order to serve these mandatory customers in 2004,

Mon Power has been obligated since January 1, 2004 to purchase power from the

interstate wholesale power market at FERC-approved market rates.

52.     The Commission's orders requiring Mon Power to sell power at retail to its

large commercial and industrial customers at the frozen rates interfere with Mon Power's

purchase of that power in the interstate wholesale power market and thus interfere with

interstate commerce.

53.     Because of the difference between market prices at which Mon Power

purchases and the frozen rates at which it sells, Mon Power has incurred and will

continue to incur significant losses from its retail sales to its large commercial and

industrial customers.

54.     In January of 2004, through January 15, the cost of wholesale power

purchased by Mon Power based on daily load forecast values has been $995,000. This is

70.4% above the average frozen generation charge permitted by the Commission, which

is $584,000. If this market price holds for the entire month of January, Mon Power could

suffer losses of $822,000 as a result of being required to make sales to its large

commercial and industrial customers at the frozen rates.

18

55. Mon Power projects that, if the rate freeze for its large commercial and industrial customers is maintained in effect through 2005 as directed by the Commission's orders, Mon Power's total losses from 2004 through 2005 will be approximately $27 to $35 million.

56. Mon Power will suffer irreparable injury as a result of not being able to recover fully its costs of purchasing power at FERC approved wholesale rates to provide service to its retail customers. Mon Power has no adequate remedy at law to redress Defendants' violations of its federal rights.

**COUNT I**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**
**AS A CONSEQUENCE OF THE**
**VIOLATION OF THE FILED-RATE DOCTRINE**

57. The allegations of paragraphs 1-56 are realleged and incorporated by reference as if fully set forth herein.

58. The Filed-Rate Doctrine, established by the Federal Power Act, 16 U.S.C. § § 824 et seq., and the Supremacy Clause of the United States Constitution, U.S. Const. Art. 6, § 2, provides that utilities purchasing power at wholesale under tariffs or contracts on file at FERC are entitled to recover the costs of those purchases in their rates when the power is resold at retail. Any order of a state utility commission that denies such recovery is preempted.

59. Mon Power purchases power to serve its large commercial and industrial customers pursuant to a contract with Allegheny Supply that is on file with FERC. Mon Power may also purchase power in the future under other tariffs or contracts that are on file at FERC. Under the Filed-Rate Doctrine, Mon Power is entitled to recover, in the retail rates that Mon Power charges to its large commercial and industrial customers, the

19

costs of the wholesale power that it purchases under its contract with Allegheny Supply, and under any other tariff or contract on file at FERC that is used to serve those customers.

60.     In its orders of October 22, 2003 and December 17, 2003, the Commission obligated Mon Power to continue selling power to its large commercial and industrial customers at the rates frozen at 1995 levels that are significantly below levels necessary to recover current market-based costs of wholesale power.  These orders prevent Mon Power from recovering the costs of power that it purchases under tariffs or contracts on file at FERC to serve its large commercial and industrial customers.

61.     The Commission's orders violate the Filed-Rate Doctrine.  Mon Power is entitled to an injunction prohibiting the Defendants from denying Mon Power its right to recover in its retail rates charged to its large commercial and industrial customers the costs of power that it purchases at wholesale under FERC-jurisdictional tariffs or contracts to serve those customers.

**COUNT II**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**
**AS A CONSEQUENCE OF THE**
**VIOLATION OF THE**
**FOURTEENTH AMENDMENT OF**
**THE UNITED STATES CONSTITUTION**

62.     The allegations of paragraphs 1-61 are realleged and incorporated by reference as if fully set forth herein.

63.     Mon Power has a property interest in the revenues it receives for the sale of electric energy to retail customers in Ohio and in the right to recover its cost of providing regulated intrastate service, including a reasonable return on investment.

64.    The Restructuring Act freezes the rates an electric utility can charge its retail customers in Ohio for a market development period that extends from January 1, 2001 until December 31, 2005. The utility's retail rates are frozen during this period regardless of the costs the utility incurs to purchase wholesale power for its customers and regardless of whether the frozen rates allow the utility to recover a constitutionally required rate of return.

65.    The Restructuring Act provides no mechanism to guarantee a constitutionally required fair and reasonable return. The absence of a mechanism to guarantee that electric utilities receive the opportunity to earn a constitutionally adequate rate of return bears no relation to any legitimate governmental purpose and is arbitrary, capricious and discriminatory.

66.    The Restructuring Act, and specifically Ohio Rev. Code §§ 4928.34(A)(6), 4928.35(A) and 4928.40, deprives Mon Power of its property right to recover its costs of providing electric energy to its Ohio customers, including a reasonable return on its investment, and is a facially unconstitutional deprivation of its property without due process of law.

67.    As a result of the deprivation of its property rights, Mon Power is entitled to an injunction preventing the Defendants from enforcing those provisions of the Restructuring Act, and specifically Ohio Rev. Code §§ 4928.34(A)(6), 4928.35(A) and 4928.40, that provide for a rate freeze without any opportunity for utilities to demonstrate a need for higher rates in order to obtain a constitutionally required fair and reasonable return on their investment.

21

WHEREFORE, Mon Power demands judgment against the Defendants as follows:

1) a declaration that the Defendants are in violation of the Filed Rate Doctrine, established by the Federal Power Act, 16 U. S. C § § 824 et seq., and the Supremacy Clause of the United States Constitution, U.S. Const. Art. 6, § 2, by refusing to allow Mon Power to recover in its retail rates charged to its large commercial and industrial customers the costs of power that it purchases at wholesale under FERC-jurisdictional tariffs or contracts to serve those customers;

2) an injunction prohibiting the Defendants from denying Mon Power its right to recover in its retail rates charged to its large commercial and industrial customers the costs of power that it has purchased or will purchase at wholesale under FERC-jurisdictional tariffs or contracts to serve those customers;

3) a declaration that Ohio Rev. Code §§ 4928.34(A)(6), 4928.35(A) and 4928.40 are facially unconstitutional;

4) an injunction preventing the Defendants from enforcing Ohio Rev. Code §§ 4928.34(A)(6), 4928.35(A) and 4928.40, to the extent that they provide for a rate freeze without any opportunity for utilities to demonstrate a need for higher rates in order to obtain a constitutionally required fair and reasonable return on their investment; and

5) a declaration that the Defendants have deprived Mon Power of rights secured by federal law in violation of 42 U.S.C. § 1983 and an award of attorney fees in accordance with 42 U.S.C. § 1988.

Respectfully submitted,

Kathleen M. Trafford (0021753)
  (Trial Attorney)
Daniel R. Conway (0023058)
Jay A. Yurkiw    (0068143)
Porter, Wright, Morris & Arthur LLP
41 South High Street
Columbus, Ohio 43215
 (614) 227-2270  Phone
 (614) 227-2100  Fax

**Of Counsel:**

C.M. Naeve
Douglas G. Robinson
Matthew W.S. Estes
Skadden, Arps, Slate, Meagher
  & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
 (202) 371-7000 (phone)
 (202) 393-5760 (fax)

Gary A. Jack
Senior Attorney
Monongahela Power Company
1310 Fairmont Avenue
Fairmont, West Virginia 26554
 (304) 367-3423

*Attorneys for Monongahela Power
Company*

23

JS 44
(Rev. 12/96)

MAGISTRATE JUDGE ABEL

# CIVIL COVER SHEET

C2 04 084

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Monongahela Power Company

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Marion, West Virginia
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

Alan R. Schriber, Chairman of The Public Utilities Commission of Ohio ("Commission"); Ronda Hartman Fergus, Member of the Commission; Judith A. Jones, Member of the Commission; Donald L. Mason, Member of the Commission; and Clarence D. Rogers, Jr., Member of the Commission.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Kathleen M. Trafford
Daniel R. Conway
Jay A. Yurkiw
Porter Wright Morris & Arthur LLP
41 South High Street
Columbus, OH  43215
(614) 227-2000;  (614) 227-2100 (Fax)

ATTORNEYS (IF KNOWN)

Duane W. Luckey
180 East Broad Street, 9th Floor
Columbus, Ohio 43215
(614) 466-4397;  (614) 644-8764 (Fax)

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                                AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT**

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

**REAL PROPERTY**

☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury – Med. Malpractice
☐ 365 Personal Injury – Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
HABEAS CORPUS:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS – Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☒ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Action brought pursuant to 28 U.S.C. §1983. Claims for declaratory judgment and injunctive relief based on violations of the Filed Rate Doctrine and the Due Process Clause.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND amount in excess of $25,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ YES  ☒ NO

## VIII. RELATED CASE(S) IF ANY   (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   2/2/04

SIGNATURE OF ATTORNEY OF RECORD   Kathleen M. Trafford

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44
### Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. **(a) Plaintiffs - Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case, filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a). F.R.C.P., which requires the jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of difference states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III. **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Origin** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

V. **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of the suit. If the cause fits more than one nature of suit, select the most definitive.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Mon Feb 2 15:59:24 2004

UNITED STATES DISTRICT COURT

COLUMBUS, OH

Receipt No.   200 239933
Cashier       rew

Check Number: 255778

DO Code     Div No.
 4661         2

Sub Acct Type Tender      Amount
1:510000  N      2         90.00
2:086900  N      2         60.00

Total Amount        $     150.00

NEW CASE C2-04-084


MONONGAHELA POWER VS ALNA R SCHRIBER ER A
L